[Cite as *State v. Jones*, 2015-Ohio-196.]

# IN THE COURT OF APPEALS OF OHIO
## SECOND APPELLATE DISTRICT
## MIAMI COUNTY

| | | |
|---|---|---|
| STATE OF OHIO | : | |
| | : | |
| Plaintiff-Appellee | : | Appellate Case No. 2014-CA-11 |
| | : | |
| v. | : | Trial Court Case No. 13-CR-193 |
| | : | |
| ADAM L. JONES | : | (Criminal Appeal from |
| | : |  Common Pleas Court) |
| Defendant-Appellant | : | |
| | : | |

. . . . . . . . . . .

## O P I N I O N

Rendered on the 23rd day of January, 2015.

. . . . . . . . . . .

ANTHONY E. KENDELL, Atty. Reg. No. 0067242, by JANNA L. PARKER, Atty. Reg. No. 0075261, Miami County Prosecutor's Office, 201 West Main Street, Troy, Ohio 45373
     Attorney for Plaintiff-Appellee

ANDREW M. ANASTASI, Atty. Reg. No. 0088440, McClain Anastasi LLC, 70 Birch Alley, Suite 240, Beavercreek, Ohio 45440
     Attorney for Defendant-Appellant

. . . . . . . . . . . .

FAIN, J.

{¶ 1} Defendant-appellant Adam L. Jones appeals from his conviction and sentence for one count of Endangering Children. He contends that his conviction is

not supported by sufficient evidence, and is against the manifest weight of the evidence. He also contends that remarks by the prosecutor during closing argument constitute prosecutorial misconduct.

{¶ 2} We conclude that Jones's conviction is supported by sufficient evidence, and is not against the manifest weight of the evidence. The evidence of Jones's guilt, while circumstantial, is compelling. We also conclude that the only objectionable remark by the prosecutor, which was not objected to, was not sufficiently prejudicial to merit reversal.

## I. A Four-Year Old Girl Sustains a Horrific Head Injury

{¶ 3} Marianne [1] a four-year old girl, was the daughter of Stephanie. Stephanie lived with Jones, her boyfriend, in an upstairs room at the home of friends Jon and Jennifer, and their three young children, on August 5, 2010, when this crime allegedly occurred. Marianne was born with VATER Syndrome, as a result of which she was missing certain organs, including no anus and no rectum, and had problems with other organs, including her liver, spine, and vertebrae. When she was two, she had a multi-organ transplant, which included the liver, the small bowel, and the pancreas.

{¶ 4} As of the time of these events, as a result of Marianne's VATER Syndrome, she was on a lot of medication, which included Prograf, an anti-rejection medication for her transplanted organs. She also received fluids every night through a central line, on the left side of her chest. Blood was also drawn for testing weekly

---

[1] A fictitious name for the victim is used in this opinion to protect her privacy.

through Marianne's central line.   Marianne also had a feeding tube, a G tube, right below her rib cage on the left side.   Marianne's mother administered medicine through the G tube.   Marianne also had an Ostomy bag for her stool, and a vesicostomy, or drain, for her undersized bladder, as a result of which she always had to wear a diaper.   At night, Marianne could receive fluid nutrition through her G tube. At other times, she could receive it by means of a pump and line that were in a book bag that she could wear on her back, which allowed her mobility.   At times during the day, Marianne would not be hooked up to anything, and she could move and play freely.

{¶ 5} On July 17, 2010, Marianne tripped and fell face down on the linoleum floor in the kitchen.   Other than Marianne crying briefly, she exhibited no other symptoms.   Two or three days later, Marianne had a routine appointment at Cincinnati Children's Hospital, where she had been treated for VATER Syndrome. Marianne's mother mentioned the fall days earlier, and a doctor examined Marianne's face.   No treatment was prescribed.   A few days later, Marianne's nose was swollen to the extent that she could not breathe through it.   She went back to Cincinnati Children's Hospital, where she was treated for an infection in her nose.   Infections were a serious problem for Marianne, because the anti-injection drugs she was taking suppressed her immune system to some extent.   She was discharged from the hospital on August 3, 2010.

{¶ 6} According to Marianne's mother, Marianne seemed to be normal after her discharge from the hospital on August 3rd.   On August 5, 2010, Marianne slept unusually late, until about 11:00.   Marianne's mother, Stephanie, took her friend,

Jennifer, to the hospital in Sydney, Ohio, leaving at about 1:30 in the afternoon. Just before leaving, Stephanie and Jones laid Marianne down in her bed, since she seemed sleepy. Stephanie left Marianne in Jones's care. According to Stephanie, Marianne seemed fine; Stephanie observed no injuries.

{¶ 7} Jones went downstairs and spent about 20-25 minutes with the children downstairs, who were playing a video game. He then went back upstairs, to find Marianne lying on her side on the floor. He described her condition as follows:

At first she was doing nothing. I seen her laying there, I said her name, she would make a – like a – like a gurgle noise like maybe she was choking on something. I got down on my knees; I rolled her over on her backside and her eyes didn't – like they looked like she was – like they might have been rolling – like in the back of her head, so I lifted her up and set her up on my – on my knee and I looked – grabbed her arms and I raised her arms up because I – I was told that if a child was choking on something to elevate their arms, and that's what I – that's what I tried to do. I didn't know what else to do. I didn't know what –

Q. Okay. And how did [Marianne] look at that point?

A. She looked horrible man. She looked real – she looked really bad.

Q. Okay. And – and so –

A. She – what I mean by that is her eyes were – you – you couldn't see her pupils. Her eyes were like rolled into the back of her –

Q. Okay.

A. – her eye – eye sockets.

{¶ 8} Jones picked up Marianne in his arms, and asked the children downstairs to call 911. Not having access to a phone, and realizing he could not count on the children for assistance, Jones, still holding Marianne in his arms, first went to one neighbor's house, and then to the next, where he was able to have the neighbor call 911 for assistance.

{¶ 9} Doug Stewart, a Piqua Fire Department firefighter paramedic, responded to the scene at 2:25 p.m. He took Marianne, by ambulance, to Upper Valley Medical Center, Emergency Department. Jones was not permitted to accompany them in the ambulance. From the Upper Valley Medical Center, Marianne was transported by careflight to Cincinnati Children's Hospital.

{¶ 10} According to Dr. Charles Stevenson, a pediatric neurosurgeon at Cincinnati Children's Hospital, Marianne presented at the hospital in the following condition:

A. She was critically ill at that time. She had had a breathing tube placed, because she could no longer breathe on her own; she was unconscious. And so she had a machine, a ventilator, breathing for her. She was unresponsive, and she had received multiple medications to help keep her heart and lungs stable, as well as to try to reduce the pressure in her brain.

* * *

Q. Okay and what was she diagnosed with then upon her arrival to you?

A.     Both at the outside hospital as well as to our hospital it was confirmed based on her CAT scan that she had a large amount of bleeding on the surface of her brain, on the left side; there was a large blood clot, which we call a hematoma lying in the subdural space, over the surface of the brain.

*  *  *

Q.     And if you could tell the Jurors what are you looking at there?

A.     These are representative single slice images from a CAT scan that was obtained, and it demonstrates a brain with a large hematoma overlying the left side of it.   Because of this volume and the mass of the hematoma within the confines of the skull, the brain itself has been shifted over and is being pushed from that side – the left side, over to the right side.

*  *  *

A.     *  *  *

In this particular case, because of the hematoma, the brain is being actually pushed over, and you can see the bowing of this structure.   It should be directly in the middle, but it's getting pushed over.   And similarly this black structure here, which represents one of the normal fluid-filled spaces of the brain that we all have; these are fluid-filled ventricles in our brain that contain our natural cerebral spinal fluid, it's being compressed over to the side.   There should be one on

the other side, which you cannot even appreciate it, because it has been closed shut by the pressure from this hematoma.

Q. And then in the next Exhibit here, which is State's Exhibit 16, it appears to be a similar image. What is being shown here?

A. This would be perhaps the next one or two slices down in the image. This is slightly lower in the brain, and you can see, it's even more definitive here that this clot is actually larger. And this right here, once again, should be in the very center of the brain. The radiologist in this case has drawn a green line to indicate to you what the center would be. All of these structures here should be over here, and they have been pushed nearly two centimeters over to the side, which for the human brain is a very significant and extreme amount typically associated with very significant injuries.

{¶ 11} After exposing the left side of Marianne's skull, Dr. Stevenson removed that side of her skull, and then carefully removed the blood clot from the exposed surface of her brain. There was an active hemorrhage, and Dr. Stevenson then stopped that fresh bleeding. When the indentation in the left side of Marianne's brain caused by the clot refilled, after the clot was removed, the brain continued to expand outward – the result of swelling of the brain caused by the injury. Consequently, the removed left side of Marianne's skull was not immediately replaced, but was stored for future use. A monitor was then used to measure the pressure inside Marianne's brain, so that medication could be administered to keep that pressure from becoming abnormal.

{¶ 12} Thereafter, in Dr. Stevenson's words, Marianne "made an amazing and dramatic recovery." Within a day or two, she was able to open her eyes and breathe on her own. Within a few days, she began talking.

## II. The Course of Proceedings

{¶ 13} Jones was charged by indictment with Endangering Children, in violation of R.C. 2919.22(B)(1)(E)(2)(d).[2] He was convicted following a jury trial, and sentenced to eight years in prison. From his conviction and sentence, Jones appeals.

## III. Jones's Conviction Is Supported by Sufficient Evidence, and Is Not Against the Manifest Weight of the Evidence

{¶ 14} Jones's First and Second Assignments of Error are as follows:

THE JURY ERRED TO MR. JONES' PREJUDICE BY FINDING HIM GUILTY OF CHILD ENDANGERING AS THOSE FINDINGS WERE NOT SUPPORTED BY SUFFICIENT EVIDENCE.

THE JURY ERRED TO MR. JONES' PREJUDICE BY FINDING HIM GUILTY OF RECKLESSLY ABUSING A CHILD AND CAUSING THAT CHILD SERIOUS INJURY AS THESE FINDINGS WERE CONTRARY TO LAW.

{¶ 15} Despite the wording of Jones's Second Assignment of Error, it is clear from his argument in support of it that he is asserting, in connection with this assignment of error, that the judgment convicting him of Child Endangering is against

---

[2] The indictment erroneously referred to R.C. 2919.22(B)(1)(E)(1)(d). At the commencement of the trial, without objection, the indictment was amended to refer to R.C. 2919.22(B)(1)(E)(2)(d), instead.

the manifest weight of the evidence.

{¶ 16} Jones was found to have violated R.C. 2919.22(B)(1), which provides, in pertinent part, as follows:   "No person shall do any of the following to a child under eighteen years of age * * * :   (1) Abuse the child; * * * ."   The jury made a separate finding under R.C. 2919.22(E)(2)(d), which provides that the offense is a felony of the second degree if it "results in serious physical harm to the child."

{¶ 17} Jones does not dispute that the injury to Marianne constituted serious physical harm.   He does dispute that he abused the child, either intentionally or recklessly.   R.C. 2919.22 does not specify a culpable mental state.   Under R.C. 2901.21(B), where no culpable mental state is specified, and the statute defining the offense does not plainly indicate a purpose to impose strict criminal liability, the default culpable mental state is recklessness.   Consequently, recklessness is the culpable mental state for Endangering Children.   *State v. McGee*, 79 Ohio St.3d 193, 195, 680 N.E.2d 975 (1997).   "A person acts recklessly when, with heedless indifference to the consequences, he perversely disregards a known risk that his conduct is likely to cause a certain result or is likely to be of a certain nature. A person is reckless with respect to circumstances when, with heedless indifference to the consequences, he perversely disregards a known risk that such circumstances are likely to exist."   R.C. 2901.22(C).

{¶ 18} As Jones notes, there is no direct evidence that he abused Marianne; no one saw him do it.   There is, however, compelling circumstantial evidence. There is Stephanie's testimony that when she left Marianne in his care, Marianne was fine; she was not exhibiting any symptoms of subdural hematoma.   Jones, who

testified, acknowledged that he was the only adult at the home when Marianne sustained her injury, and that the three other children present were in another room, downstairs, playing a video game.

{¶ 19} Dr. Stevenson, the treating pediatric neurosurgeon, described the ways that a subdural hematoma like Marianne's could have occurred:

> There are many ways. We see these almost always in the setting of some sort of traumatic injury. Common mechanisms that we see are a child that's involved in a motor vehicle collision. Unfortunately a child that's on a bicycle or an all-terrain vehicle without a helmet, a fall from some significant height such as out of a tree or out of a second or third story window, or off the top of a – a bunk bed or some similar height. Trauma is in the pediatric population by far and away the most common cause of hematomas such as this subdural hemorrhages. [sic.]

{¶ 20} Jones's counsel suggested to Dr. Stevenson that if Marianne had suffered a subdural hematoma previously, then a less traumatic impact might have caused the severe subdural hematoma she presented with. This resulted in the following testimony by Dr. Stevenson:

> Q. Correct. And I guess, and I want to get back to this, if – if [Marianne] had suffered a prior subdural hematoma, okay, the fact that she suffered a second subdural hematoma, is it possible that the second subdural hematoma, that you note, the large bleed, could have been caused by something less than what we talked about before,

because you've indicated that normally these are caused by high falls, I guess high-impact car accidents, these kinds of things, right?

A. Uh, huh.

Q. So is it possible, okay that if you have an underlying one that was minor, okay, and you suffered an injury on the same space or same part, that the gravity of the second one could have been caused by something less than that type of –

A. If there had already been a significant trauma that caused the first one –

Q. Uh huh.

A. – and there was a repeat trauma to the exact, same place –

Q. Right.

A. – to the exact same injured vessels – I've not ever seen that personally–

Q. Uh huh.

A. – but theoretically that is possible.

{¶ 21} Dr. Stevenson testified that he did not see evidence of an older, minor subdural hematoma, although he admitted that he might not have seen evidence of one even if there was evidence; his main concern was treating the life-threatening emergency with which he was presented. He also testified that he made no connection between Marianne's presenting condition and either her VATER Syndrome or her recent nasal fracture.

{¶ 22} Dr. Kathi Makoroff, a child abuse pediatrician who was involved as a

consultant in Marianne's treatment at Cincinnati Children's Hospital, ruled out possible causes of Marianne's subdural hematoma other than a traumatic injury involving a "great bit of force":

A. Sure well just to back up so – you – you are correct when you say the word "injury." So injury is the most common cause of a subdural hematoma in – in – in children. If I can put that aside for a second just to list – there are other causes of subdurals, so it can happen from the birthing process, although very rare. It can happen in people and kids with certain cancers, brain tumors, as well as leukemias can get subdural hematomas, and those are – those are not that – that common either. And also it can happen in people with bleeding disorders. So people who have problems clotting their blood, who, who – you know, who have a condition and that they can't clot their blood easily until [sic] they bleed more easily, you can see subdurals. Those are, those are also rare.

And so those things I can – I – so I like to include those on the list, just so people are aware that injury, although by far the most common, isn't the only cause – the reason to have a subdural, but those conditions I just listed we, we could easily rule out in [Marianne]. She did not have any problems with her ability to clot. There were tests that we – that – that were performed that showed that her clotting function was – was just fine, was very normal. And she had not shown any problems with that in the – in – in the recent past. And certainly we

have a CAT scan, so we know – and we have a few of them, so we know that she didn't have any kind of a brain tumor. And we also had lab results to show that she didn't have any leukemia, and certainly it's – we're a few years out from – from this time, so certainly we would know by know [sic] if she had any kind of cancer. So that leaves us with injury.

And so finally getting to your – to – to your question about the mechanism of – of subdurals, I don't – again I don't want to just sort of answer it – blank – blank, you know sort of blankedly [sic] because certainly lots of types of injuries can cause a subdural. But I think to – to frame your question and to cause a subdural such as this one that we're seeing in [Marianne], it's a fairly large subdural hematoma. It's taking up most of the left – left side of her – of her brain, and actually pushing on her brain, and you know, and causing a problem to her brain matter itself; that's how large it is. So to answer the question to cause a – a subdural of this size, requires a great bit of force. And so I can't tell you exactly what the number is, nor should a physicist be able to come in and tell you sort of how many pounds per square inch a force should this require, because that – of course the human body is very complex. To be able to know that answer, we would have to do experimentation on actual people, which should – that type of experiment should never be done. So we really can't tell you how much force.

Whenever I'm asked that question, I said "I can't answer that – that in numbers," but I can tell you what doesn't cause it; what types of injuries doesn't – does not cause it, and what types of injuries do. So we know that we see kids all the time who fall – fall down steps and have household falls, and even play – fall from playground equipment. And they do not get these types of injuries. Many of those children never come for care. Obviously if [Marianne] never came for care, she – she most likely would have died from this. So a lot of children don't even come in for care after falling, you know, from a kitchen counter or – or a couch, or falling down steps or falling from playground equipment. And many people have had this experience with their children. And I evaluate children all the time who – who – who have these – these types of falls, and they don't have – and they don't have injuries like this.

We see these types of injuries in kids who have severe car accidents and are ejected from the car or to very severe accidents. Kids who have very severe falls, like falling out of the – out of a window, you know, not on the first floor of the house but subsequent floors of the house, and we also see it in children with inflicted injury or abusive head trauma when they come in and they have injuries similar to – to – to what we see on [Marianne's] CAT scan.

Q. I want to jump back a little bit to some of our discussion about when [Marianne] was treated and not – in Cincinnati Children's

from July 25th to August 3rd, because there was a – a concern for infection, because of the clot in her nose. What – does – is there any relationship between that concern for infection and a cause of this subdural hematoma?

A. So that's a great – a great question, and – and – and certainly you can get a subdural – I'm not aware that it would look like this, but if – if a patient has meningitis too can cause a – can cause a subdural hematoma, but it wouldn't look like this. And – and – and certainly we know Dr. Stevenson just sort of, you know, had samples of what he took from – from [Marianne's] brain, and there wasn't any infection or meningitis in there. So we know that, and we also know that she was in the hospital for a long time after August 5th. So certainly she wasn't being treated for meningitis, so it would have gotten worse. And it – and it did not. So we can rule out – it's a – it's a – it's a good question because the nose and the head are close. It's a sort of theoretical possibility to get infection that spread, but in her case it did not. So we can – we can rule that out as a cause.

**{¶ 23}** Dr. Makoroff also testified that neither Marianne's recent nose injury, nor her VATER Syndrome contributed to her subdural hematoma.

**{¶ 24}** Finally, Dr. Makoroff ruled out Marianne's having fallen from, or having jumped off, her bed as a possible cause of her injury:

A. So I could also rule out that history of a – of a roll off of a bed or even a jump off a – off of a bed from something so small, you know,

thirteen inches off of the floor and onto carpet, which, you know, obviously has some padding to it; the carpet itself has – has some padding properties to it.   And so I'm left with inflicted injury or abusive head trauma.

* * *

A. Right so it goes back to your question about the amount of force required.   So even though we can't give you – we can't give you a number of the amount of force, it certainly lies between kids who, and you know, most people know someone – know a child and maybe some of the Jurors were that child who, you know, went down the steps on a skateboard because it was fun, or was klutzy or climbed a lot and had lots of falls, and those kids don't end up like this.   Those kids don't come into the emergency room emergently and then require surgery to evacuate the blood.   So even though those kids are either klutzy or very sort of rambunctious and often doing things and – and hitting their head requiring sutures or staples, you know, to – because they're hitting their head and getting – and getting lacerations, they still don't – they still don't cause these types of injuries.   But the really more forceful types of mechanisms, like a car accident, do.   So the answer to your question is even the rambunctious child who is maybe jumping on the bed and even hits their head in the room, just – just – it's not – it's not enough injury to cause this type of subdural.

{¶ 25} When asked what sort of abusive act could have caused injuries like the

ones Marianne sustained, Dr. Makoroff testified:

> A. So again, I can't rule out there wasn't an impact to her head; I mean she doesn't have skull fracture, but just because there isn't a skull fracture doesn't mean she wasn't impacted especially if she was impacted onto a soft surface. That may be enough of an impact to cause injury, but not enough of an impact, or an impact onto the wrong type of surface to cause a skull fracture. Or certainly a shaking; if she was picked up and shaken violently, that would cause these types – this type of subdural, these types of injuries. And of course there's no impact there; she wasn't actually impacted onto a hard or soft surface, which would go along with her not having a skull fracture.

**{¶ 26}** Dr. Makoroff ruled out the possibility that a prior minor subdural hematoma, followed by "a trivial fall like falling out of a bed thirteen inches" high, could have caused Marianne's injury. She concluded that Marianne's injury was caused by abusive head trauma.

**{¶ 27}** Dr. Michael Gray, a pediatric ophthalmologist at Cincinnati Children's Hospital, testified that both of Marianne's retinas had multi-layered hemorrhaging, which could be caused by severe trauma, usually of the head. He testified that swelling of the brain would not cause retinal hemorrhaging.

**{¶ 28}** We have set forth the tests for sufficiency- and weight-of-the-evidence review in *State v. Henderson*, 2d Dist. Montgomery No. 26018, 2014-Ohio-4601, ¶s. 22-23:

> A sufficiency-of-the-evidence argument challenges whether the

state has presented adequate evidence on each element of the offense to allow the case to go to the jury or to sustain the verdict as a matter of law. *State v. Thompkins*, 78 Ohio St.3d 380, 387, 678 N.E.2d 541 (1997). The proper test to apply to the inquiry is the one set forth in paragraph two of the syllabus of *State v. Jenks*, 61 Ohio St.3d 259, 574 N.E.2d 492 (1991): "An appellate court's function when reviewing the sufficiency of the evidence to support a criminal conviction is to examine the evidence admitted at trial to determine whether such evidence, if believed, would convince the average mind of the defendant's guilt beyond a reasonable doubt. The relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt."

When analyzing a challenge to the manifest weight of the evidence, the court, reviewing the entire record, weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determines whether in resolving conflicts in the evidence, the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered. *State v. McKnight*, 107 Ohio St.3d 101,112, 2005–Ohio–6046, 837 N.E.2d 315. The discretionary power to grant a new trial should be exercised only in the exceptional case in which the evidence weighs heavily against the conviction. *Id.*

{¶ 29} Circumstantial evidence and direct evidence inherently possess the same probative value. *State v. Jenks*, 61 Ohio St.3d 259, 574 N.E.2d 492 (1991), paragraph one of the syllabus. It is primarily for the finder of fact to determine what weight to assign to any evidence, but evidence is not to be given less weight merely because it is circumstantial.

{¶ 30} In the case before us, the circumstantial evidence is compelling that Jones physically abused Marianne, and thereby caused her serious physical harm. When Marianne was left in his care, she did not have the brain injury that she had after she was in his care. He was the only adult in her presence. By his admission, the three other children in the house were on another floor, playing a video game.

{¶ 31} Drs. Stevenson and Makoroff ruled out possible causes of Marianne's injury other than physical abuse, either in the form of impact to Marianne's head against a soft surface, or severe shaking. Under the circumstances, a reasonable trier of fact could conclude that Jones was the person who caused Marianne's injury, if not intentionally, at the very least recklessly, since a reasonable person would know that the impact to Marianne's head or the severe shaking necessary to cause her injury would likely cause her serious physical harm.

{¶ 32} We conclude that there is sufficient evidence in the record to permit a reasonable trier of fact to find, beyond reasonable doubt, all of the elements of the offense of which Jones was convicted, and also that his commission of the offense caused the victim serious physical harm. Jones's First Assignment of Error is overruled.

{¶ 33} We also conclude that Jones's conviction is not against the manifest

weight of the evidence. This is not the exceptional case where the evidence weighs heavily against conviction, the jury having lost its way, resulting in a manifest miscarriage of justice. Jones's Second Assignment of Error is overruled.

## IV.    There Is No Prosecutorial Misconduct
## Sufficiently Prejudicial to Warrant Reversal

{¶ 34} Jones's Third Assignment of Error is as follows:

THE TRIAL COURT ERRED TO MR. JONES' PREJUDICE IN ALLOWING THE STATE TO MAKE MULTIPLE IMPROPER COMMENTS IN ITS CLOSING.

{¶ 35} None of the comments by the prosecutor to which Jones now takes exception were the subject of an objection at trial. The first of the comments is the italicized statement in the following portion of the State's initial closing argument:

And as Dr. Makoroff testified, when – shortly after receiving these injuries, she would be looking very abnormal is what she said, and what – what she described then later in her testimony is that abnormal would be the symptoms that she showed of being unconscious and of what appeared to be seizure-like behavior. Those were the symptoms that she considered as abnormal, and those were the things that happened when [Marianne] was alone with the defendant. And Dr. Stevenson also said that she'd be symptomatic within minutes; minutes to hours. And who was she with in the minutes to hours before that? She was with the defendant.

There is only a small window of opportunity for this to have happened. That's even in the name of what she had – acute subdural hematoma; new, fresh, recent, subdural hematoma. He's the only one in that window when this could have happened and *it just could not have happened the way the defendant said it did. It could not have happened as he tells it.* A kid doesn't go down for a nap and wake up with a massive brain bleed. (Italics added.)

**{¶ 36}** Jones contends that the italicized statement constitutes an expression of the prosecutor's personal belief as to Jones's credibility or guilt. But, as we observed in *State v. Smith*, 2d Dist. Montgomery No. 25462, 2013-Ohio-5345, ¶ 30, a case Jones cites, the remark of which he complains was "linked * * * to the evidence presented at trial." Similarly, in the case before us, the prosecutor's comment that Marianne's injury could not have happened as Jones testified was linked to the evidence contradicting Jones's version of what happened. A prosecutor may not express personal belief as to a defendant's credibility, but the prosecutor is not required to refrain from pointing out that it is rebutted by other evidence in the record. In our view, that is what the prosecutor in this case was doing – pointing out that Jones's version of what happened was inconsistent with the medical testimony it had presented to the jury. This is within the scope of proper closing argument.

**{¶ 37}** The next comment of which Jones complains is the italicized statement in the following portion of the State's initial closing argument:

They are not an injury caused by an unrelated prior event, like the fractured nose. No matter what defense counsel tells you, use

your collective memory; no doctor or any other witness ever said there is an old injury that's related to the injury she suffered on August 5, 2010. *There was a lot of stretching of facts and information to – to arrive at some theoretical possibilities,* but these experts had never seen that in their careers, and the actual specific evidence in [Marianne's] medical history – it doesn't support any of those theoretical possibilities. That's what you can rely on. (Italics added.)

**{¶ 38}** In our view, the comment Jones finds offensive is a fair comment on the evidence. The defense, in cross-examining the medical witnesses, did posit theoretical possibilities that might account for Marianne's injuries, including the exchange with Dr. Stevenson quoted in Part III, above, in which he was asked if the injuries could have resulted from her earlier fall. And the medical experts did testify that these were theoretical explanations never seen by them in their careers, that were at odds with the medical evidence in this case.

**{¶ 39}** Finally, Jones takes exception to the italicized statement in the following portion of the State's initial closing argument:

Now defense counsel told you in opening statement that you won't hear from any witness who saw what happened, how saw him did (sic)[3] it, and you won't hear that he confessed to it, and that's true. But you can't stop there. *If we as law enforcement stopped every time there wasn't an eye witness to a crime or somebody that didn't confess to it, we wouldn't be doing our jobs. So here's your chance to do your*

---

[3] "(sic)" is in the transcript.

*job.* The defendant was the only one. And the opportunity to injure her in a way that can only happen by an act of abusive head trauma that resulted in a little girl who would have died, without the lifesaving efforts of her doctors and nurses and all the medical staff at Upper Valley and Cincinnati Children's.

**{¶ 40}** We agree with Jones that the State's juxtaposition of the jury's job with law enforcement's job of obtaining a conviction despite the lack of direct evidence had the unfortunate effect of implying that the jury's job was not to weigh the evidence impartially and find the facts, applying the reasonable-doubt standard of proof, but to ensure the defendant's conviction, despite any weakness in the evidence against him. Because there was no objection, this assignment of error is governed by the plain-error standard of appellate review. Consequently, the error must have had a strong likelihood of affecting the outcome, resulting in a manifest miscarriage of justice. *State v. Thompson*, Slip Opinion No. 2014-Ohio-4751, ¶ 73.

**{¶ 41}** In our view, the State's reference to the job of the jury did not rise to the level of plain error. In remarks made by counsel during voir dire, in both counsel's opening statements, in the trial court's initial jury instructions, elsewhere in the closing arguments, and in the trial court's final jury instructions, it was made clear to the jury that their role was to be the finder of facts, and that they were required to find every element of the offense proven beyond reasonable doubt before returning a guilty verdict. We conclude that the one unfortunate remark during the State's initial closing argument was not likely to have confused the jury about its responsibility as a neutral adjudicator of the facts.

{¶ **42**} Jones's Third Assignment of Error is overruled.

## V.      Conclusion

{¶ **43**} All of Jones's assignments of error having been overruled, the judgment of the trial court is Affirmed.

. . . . . . . . . . . . .

FROELICH, P.J., and WELBAUM, J., concur.


Copies mailed to:

Anthony E. Kendell
Janna L. Parker
Andrew M. Anastasi
Hon. Christopher Gee